IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**VIVIAN BELT,**

    **Plaintiff,**

**vs.**                                                                **No.  04cv0372 DJS**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

## MEMORANDUM OPINION

    This matter is before the Court on Plaintiff's (Belt's) Motion to Reverse and Remand for a Rehearing **[Doc. No. 11]**, filed September 13, 2004, and fully briefed on November 10, 2004.  On January 16, 2004, the Commissioner of Social Security issued a final decision denying Belt's claim for supplemental security income benefits.  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to remand is not well taken and will be DENIED.

## I.  Factual and Procedural Background

    Belt, now sixty-one years old (D.O.B. November 23, 1943), filed her application for supplemental security income benefits on April 3, 2002, alleging disability since December 29, 2000 (Tr. 45), due to low back pain, neck pain, and dizziness.[1]  Tr. 13.  Belt has a high school education, two years of college, and past relevant work experience as a sales clerk at a thrift store.  Tr. 57.  On January 16, 2004, the ALJ denied benefits, finding Belt's was not disabled as

---

    [1] At the administrative hearing, Belt amended her alleged onset date to April 3, 2002.  Tr. 128.

she could perform her past relevant work as it is generally performed in the national economy. Tr. 16-17.  Belt filed a Request for Review of the decision by the Appeals Council.  On March 10, 2004, the Appeals Council denied Belt's request for review of the ALJ's decision.  Tr. 5.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  Belt seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Servs.,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must

meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

3

In support of her motion to reverse, Belt argues the ALJ erred when he failed to "perform a proper step 4 analysis in his rush to deny benefits." Pl.'s Mem. Br. at 2. In his decision, the ALJ found:

> The claimant worked at a thrift shop in Deming until 2000. <u>She testified that she did a lot of lifting, carrying, and moving furniture</u>. She claims [to] have constant pain in her right hip, but has not sought or received treatment for this complaint. She has failed to establish any medically determinable impairment [due] to her right hip. She also complains that her feet swell, but again she has not established any medically determinable impairment which could be reasonably expected to cause this condition. She testified that she gets migraine headaches, but again has not established any medically determinable impairment which could be reasonably expected to cause this condition. She complains of dizzy spells, but again has failed to establish any medically determinable impairment which could be reasonably expected to cause these complaints. She claims to have memory problems, but again has no medically determinable impairment associated with this condition. She says that her daughter helps her with financial affairs and with heavier housework. She claims that she can no longer read or crochet due to blurred vision. However, the vision in her right eye is 20/40 and the vision in the left eye is 20/25 without glasses (Exhibit 1F). She has not sought or received treatment for complaints of dizziness. She takes over-the-counter pain medication and muscle relaxant for her complaints (Exhibit 7E). When she applied for benefits she was <u>taking no medication</u> at all (Exhibit 2E). She does not complain of side effects. When she applied for benefits she noted that part of the reason for quitting work in December 2000 was to care for her ailing husband, who receives supplemental security income (Exhibit 2E). **After reviewing the record is (sic) a whole, considering the level of treatment received, and the lack of objective findings, I substantially discount her complaints of disabling pain and limitation**.
>
> Accordingly, **the undersigned finds the claimant retains the following residual functional capacity to perform the requirements of light work on a sustained basis. She can lift and carry 10 pounds frequently and 20 pounds occasionally. She can stand and walk for up to six hours in an eight-hour day**. Her treating physician acknowledges that she retains the ability to lift 10 to 15 pounds frequently and up to 25 pounds infrequently. She can stand and walk for four to six hours in an eight-hour day (Exhibit 6F). This opinion is consistent with the record as a whole and is entitled to controlling weight. The consultative examiner concluded that the claimant had no exertional limitations at all (Exhibit 1F).
>
> Based upon the claimant's residual functional capacity, the Administrative Law Judge must determine whether the claimant can perform any of her past relevant work. The phrase "past relevant work" is defined in the Regulations at 20 C.F.R. §416.965. The work usually must have been performed within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long enough for the claimant to learn to do the job and meet the definition of substantial gainful activity.

> <u>The evidence in this case</u> established that the claimant has past relevant work as a retail sales clerk.
>
> Based upon the residual functional capacity, the claimant could return to her past relevant work as a retail sales clerk. **The claimant has the ability to perform this job as it is generally performed in the national economy.**
>
> <u>The Dictionary of Occupational Titles describes the position of retail sales clerk as light work</u>. The claimant has failed to establish that she could not perform the mental and physical requirements of her past relevant work **as it is generally performed in the national economy.**

Tr. 15-16.  Belt's medical records, <u>in their entirety</u>, are as follows:

On **October 25, 1999**, a nurse practitioner at the Ben Archer Clinic examined Belt.  Tr. 101-102.  On that day, Belt complained of neck pain for two months.  Tr. 101.  The nurse practitioner noted: "reports intermittent shooting, stinging pain laterally to shoulders.  Denies that ROM (range of motion) of neck causes pain.  Specific c/o stinging in shoulder right to mid-trapezius.  Pain was not sudden onset."  *Id.*  The nurse practitioner noted Belt's job duties at St. Vincent De Paul in Deming as "sweeps/mops floors, lifts/drags boxes of clothes, furniture, sacks."  *Id.*  The physical examination indicated point tenderness of the paraspinous muscles at C6, point tenderness of the "trapezii bil (bilaterally) with palpation with radiation of tingling to left arm on palpation of trapezius left."  *Id.*  The nurse practitioner assessed Belt with "consider DDD (degenerative disc disease) at the c-spine, and para-spinous muscle tenderness.  The nurse practitioner ordered x-rays of the c-spine and prescribed a trial of Ibuprofen 600 mg every six hours with food or milk.  Tr. 102.  The x-ray results indicated "degenerative change in C5-6 disc space with encroachment of the right C5-6 foramen."  Tr. 104.

On **June 12, 2002**, with the assistance of a claims representative, Belt completed a Daily Activities Form.  Tr. 73-82.  In this form, Belt described an average day as: "Gets up at 06:00, has coffee, gets invalid husband up– bathing & dressing him, & takes him to therapy.  Prepares

meals, does all household chores. A great part of the day is spent taking care of disabled husband. Goes to bed at 09:00." Tr. 73. Belt also stated she did "all shopping, banking and all running around for family– does not have a vehicle, does a lot of walking, can drive." *Id.* In response to the question, "Do you do any household chores or yard work? Include cleaning, laundry, ironing, vacuuming, maintenance, moving, watering, etc.," Belt stated she "[did] everything around the house." Tr. 74. Belt also stated she did the shopping once a month and relied on her daughter for transportation. Significantly, Belt reported that "most of her day is consumed taking care of disabled husband." *Id.* Belt also reported taking no medications. Belt reported she could walk one block but had to "rest in between" and her "feet swell up." Tr. 79.

On **July 7, 2002**, at the request of the agency, Dr. Andrew Maslona evaluated Belt. Tr. 94-98. Dr. Maslona noted Belt presented with "allegations of back and neck pain and dizziness." Tr. 94. Belt told Dr. Maslona she had experienced back pain for over twenty years but "the pain really affected her when she went to work in 2000." *Id.* Belt complained that the pain was worse with lifting, standing, and better with sitting. *Id.* With regard to her neck pain, Belt reported "this is the more disabling of her symptoms and is characterized by burning pain that is also associated with lifting." *Id.* Finally, Belt reported "occasional dizziness when she lifts objects, but den[ied] any fainting or loss of consciousness." *Id.* The dizziness also was associated with headaches and improved by resting. Dr. Maslona performed an physical examination which was unremarkable. Dr. Maslona noted:

> PHYSICAL EXAMINATION:
> Vital signs: Height 61 ½ inches, weight 120 pounds, blood pressure 130/80, pulse 66, respiratory rate 21.
>
> General examination: The patient is well-nourished, well-developed female in no acute distress. She ambulates without difficulty, and is able to get on and off the exam table and

the chair without problems. She undresses and dresses herself without assistance. Hearing and speech are grossly normal.

Skin: Without rash, cyanosis, jaundice or clubbing.

HEENT: Pupils are equal, round, and reactive to light. Extraocular movements are intact. The tympanic membrane shows large amount of cerumen without evidence of infection. Poor dentition is noted without evidence of abscess or dental infection. The oropharynx is otherwise clear. Vision was tested with a standard Snellen chart at 20 feet. Right eye 20/40, left 20/25 without glasses.

Neck exam: Showed no lymphadenopathy or goiter.

Chest exam: Clear to auscultation.

Heart exam: Showed regular rate without murmur.

Abdominal exam: Showed no masses, hepatosplenomegaly or hernia.

Spine exam: Showed straight spinal column, with minimal tenderness in the cervical region without evidence of deformity.

Extremities: Normal without deformity, atrophy, cyanosis, clubbing or edema. The patient ambulated normally without the use of an assistive device. Grip strength was normal bilaterally. Fine and gross manipulations were normal.

Range of motion: Range of motion is normal in the elbows, forearms, wrists, and shoulders. In the cervical spine, flexion was reduced to 20 degrees, normal extension, lateral flexion and rotation. Range of motion was normal in the lumbar spine, hips, knees, and ankles. Supine leg raise test was normal. The patient was able to lay straight back on the examination table. She was able to walk on her heels, toes, do a tandem heel walk, and squat to the floor.

Neurologic exam: Mentation is grossly normal. Motor strength is 5/5 in all extremities. Sensory examination was normal. Cerebellar, cranial nerves, and deep tendon reflexes were normal.

X-ray examination was performed of the cervical and lumbar spines. Cervical spine showed normal alignment of all vertebra with normal intervertebral disc spaces. There is no evidence of fracture. Lumbar spine also showing two views showed normal alignment of all vertebrae with normal intervertebral spaces, no evidence of fracture.

IMPRESSION:
1. Neck pain with no evidence of a neurological deficit and mildly decreased range of motion for cervical flexion.

2. Low back pain without evidence of a neurological deficit, decreased range of motion. No assistive devices needed.

    3. Dizziness of unclear etiology without evidence of cardiovascular or central nervous system disease.

    4. Epigastric and chest pain, consistent with gastroesophageal reflux, disease without evidence of angina.

Tr. 95-96. Dr. Maslona completed a Medical Source Statement of Ability To Do Work-Related Activities. Tr. 97-98. Dr. Maslona noted Belt had **no limitations**. Tr. 97.

On **August 21, 2002**, with the assistance of her attorney's secretary, Belt completed a Reconsideration Disability Form. Tr. 83-86. In this form, Belt reported "constant back & neck pain; problems w/ sleeping; having severe headaches, dizziness; poor eye sight (sic); pain of l knee; depression; occasional chest pain; memory & concentration problems." Tr. 83. Belt also reported she had not seen any physician or been treated at a clinic since she filed her disability claim.

In her undated "Statement When Request for Hearing is Filed," Belt claimed "more sever (sic) pain, can't walk a block with out (sic) my feet swellowing (sic)" and "always in pain have to have someone come in to help me with my house work." Tr. 87. Belt also listed "Extra streath (sic) tidinol (sic) two three times a day" as the medications she was taking. Tr. 88.

On **June 19, 2003**, Belt's counsel submitted a letter to the Office of Hearings & Appeals. Tr. 92. In this letter, Belt's counsel refers to a Statement of Claimant[2] pertaining to her Consultative Evaluation by Dr. Maslona." *Id.* Citing to 20 C.F.R. § 416.919n(a), Belt's counsel complained that Dr. Maslona did not spend the required amount of time on Belt's examination.

---

[2] Belt's statement complained that Dr. Maslona spent 15-20 minutes on her examination and "acted like he felt the examination was just something that he had to get out of the way." Tr. 93. Belt also stated, "I do not want my SSI claim decided by Dr. Maslona's report because it does not fairly describe my condition." *Id.*

Counsel also requested the Office of Hearings & Appeals consider referring Belt to a rheumatologist or orthopedic specialist.

On **January 28, 2003**, Belt presented at the Ben Archer Clinic with complaints of back, shoulder, neck, and hip pain for one year. Tr. 105. The physician examined Belt and noted, "right paraspinal discomfort" and directed Belt to continue taking the Motrin.

On **February 25, 2003**, Belt presented at La Clinica de Familia with complaints of neck, knee, and back pain. Tr. 109. The health care provider noted: "history of DJD (degenerative joint disease) neck, back, getting worse, neck worst, no specific treatment; taking Ibuprofen, extends to back (lumbar), also left knee pain for one year, no swelling/redness, worse with walking . . . ." *Id.* The examination showed slight decrease of ROM in the neck, the left knee had normal ROM and no effusion. The physician ordered lab work to check Belt's glucose and lipids. The physician also directed Belt to continue taking the Ibupropen and try Darvocet N100. The results of the lab work showed elevated cholesterol and triglycerides levels. Tr. 110.

On **April 1, 2003**, Belt presented at La Clinica de Familia with complaints of "left ear plugged/painful." Tr. 108. The examination revealed "mild erythema of the L TM (left tympanic membrane)." *Id.* The diagnosis was "serous effusion of the left inner ear." *Id.* The health care provider treated Belt with antibiotics and started her on Lipitor for her elevated cholesterol and triglycerides levels.

On **July 17, 2003**, Belt was seen at La Clinica de Familia for burning pain of her neck and elevated cholesterol and triglycerides. Tr. 114. The health care provider prescribed Lipitor and Flexeril, a muscle relaxant. Lab results dated July 15, 2003 reflected elevated cholesterol and triglycerides. Tr. 116.

On **November 10, 2003**, Belt returned to La Clinica de Familia. Tr. 113. Belt complained of allergies. The health care provider diagnosed Belt with allergic conjunctivitis. The health care provider directed Belt to restart the Lipitor and gave her a prescription for Flexeril.

On **November 18, 2003**, Belt's counsel wrote to Dr. Maslona. Belt's counsel wrote, in part:

> Would you kindly state in a letter to me the difficulties, if any, that your patient would have with performing medium level work on a full time and sustained basis. Please assume that medium level work would require frequent (1/3 to 2/3 of the time) lifting or carrying of objects weighing up to 25 pounds and less lifting with a maximum of 50 pounds. Medium level work would also require her to be on her feet up to six hours out of every eight hour work day.

Tr. 119.

On **November 21, 2003**, Dr. Maslona responded to counsel's letter. Dr. Maslona responded:

> Based on my examination of Vivian Belt since February, 2003, I believe this patient would have mild to moderate difficulties performing at the work level described in your letter of 11/18/03. Due to her chronic neck, back, and knee pain, I would recommend frequent lifting and carrying of up to 10 to 15 pounds, and infrequent lifting of up to 25 pounds. I would recommend work that would require being on her feet four to six hours per eight hour shift.

Tr. 118.

Belt argues the ALJ erred in his step four analysis. At step four of the sequential evaluation process, a claimant bears the burden of proving that her medical impairments prevent her from performing work she has performed in the past. *See Williams v. Bowen*, 844 F.2d 748, 751 & n.2 (10th Cir. 1988). A step-four analysis is comprised of three phases. In the first phase, the ALJ must evaluate a claimant's physical and mental residual functional capacity, and in the second phase, he must determine the physical and mental demands of the claimant's past work. In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands

found in phase two despite the mental and/or physical limitations found in phase one. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir.1996).

Belt claims the ALJ erred in finding she had an RFC for light work. In support of her argument, Belt contends the ALJ determined her RFC based "on an RFC assessment provided by Andrew Maslona, M.D." Pl.'s Mem. Br. at 4. Because "Dr. Maslona's [RFC] assessment is for less than the full range of light work," Belt contends "the RFC finding the ALJ made at the first phase of the step four analysis did not accurately reflect [her] exertional limitations." *Id.* Additionally, Belt argues "there is no evidence that [she] could lift and carry twenty pounds on an occasional basis as required for light work." *Id.*

The ALJ found Belt retained the RFC to perform light work. Specifically, the ALJ found, "She can lift and carry 10 pounds frequently and 20 pounds occasionally. She can stand and walk for up to six hours in an eight-hour day. " Tr. 16. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. § 416.967(b)." Social Security Ruling 83-10 states, in part, "[T]he full range of light work requires standing or walking, of and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, *6 (1983). Thus, the ALJ's RFC assessment is consistent with the agency's definition of light work.

Generally, the ALJ must "give controlling weight to a treating physician's well-supported opinion, so long as it is not inconsistent with other substantial evidence in the record." *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001). Dr. Maslona opined Belt could lift 10 to 15 pounds frequently and up to 25 pounds infrequently. These weights are higher than those the ALJ found Belt was capable of lifting. Dr. Maslona also recommended work that would require Belt

11

to be on her feet four to six hours per eight hour shift. Tr. 118. The ALJ considered Dr. Maslona's recommendation. However, the ALJ found Belt could stand and walk for up to six hours in an eight-hour day. This was proper. As Belt concedes, the RFC assessment is an administrative finding, reserved solely to the ALJ and based upon the totality of the evidence of record. 20 C.F.R. §§ 416.945(a)(1),(3) & 416.946(c). Moreover, Social Security Ruling 96-5p is clear on this issue and states:

> Residual Functional Capacity Assessments and Medical Source Statements
>
> The regulations describe two distinct kinds of assessments of what an individual can do despite the presence of a severe impairment(s). The first is described in 20 C.F.R. 04.1513(b) and (c) and 416.913(b) and (c) as a "statement about what you can still do despite your impairment(s)" made by an individual's medical source and based on that source's own medical findings. This "medical source statement" is an opinion submitted by a medical source as part of a medical report. The second category of assessments is the RFC assessment described in 20 C.F.R. 404.1545, 404.1546, 416.945, and 416.946 which is the adjudicator's ultimate finding of "what you can still do despite your limitations." Even though the adjudicator's RFC assessment may adopt the opinions in a medical source statement, they are not the same thing: **A medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding <u>based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)</u>**.

SSR 96-5p, 1996 WL 374183, *4 (1996). In this case, the ALJ accorded Dr. Maslona's opinion the weight accorded to a treating physician's opinion and considered it, along with all the evidence, in arriving at his RFC assessment. Accordingly, the Court finds no error in the ALJ's RFC assessment at the first phase of the *Winfrey* analysis.

Belt's second argument that "there is <u>no evidence</u> that she can lift and carry twenty pounds on an <u>occasional</u> basis as required for light work" is without merit. Dr. Maslona, her treating physician, opined she could lift 10 to 15 pounds frequently and up to <u>25 pounds infrequently</u>. Occasionally is defined as "taken at irregular or *infrequent* intervals." *Webster's*

*Collegiate Dictionary* 803 (10th ed. 1994). The Court has meticulously reviewed the record and finds substantial evidence supports the ALJ's finding that Belt can lift and carry 10 pounds frequently and 20 pounds occasionally.

Belt's next argues that the ALJ failed to ask her questions about her past work at the administrative hearing and made no findings in his decision about the physical requirement of her work. Pl.'s Mem. Br. at 5. In her brief, however, Belt states "she testified at the hearing that she had worked at a St. Vincent DePaul Society Thrifty Store doing sales, customer service, feeding the poor, sorting clothes, selling furniture, and moving many heavy objects." *Id.* (citing to Tr. 130-31). The record also indicates Belt completed a Disability Report Adult. Tr. 55-64. Under Section 3, Information About Your Work (SSA-3369-BK),[3] Belt described her job at St. Vincent De Paul as "ring up sales" and "help customers." Tr. 57. Under "Lifting and Carrying," Belt noted, "moved furniture, helped load furniture." *Id.* Belt also listed 25 pounds as the weight "frequently lifted." *Id.*

Belt also completed a Work History Report. Tr. 65-72. In this form, Belt described her job at St. Vincent De Paul as "use vaccume (sic) cleaner, assisted customers with sales, used cash register, reports on cash, tenants stay, entered information on donations received." Tr. 67. Under Lifting and Carrying, Belt noted, "use hand truck to move stoves, beds etc, always moving items in or out of store." *Id.* In this report, Belt claimed she frequently <u>lifted less than 10 pounds</u>. In another form titled "CLAIMANT'S WORK BACKGROUND," under duties performed, Belt listed "fed homeless, sewed, helped with store (on feet, 25-30 # (minutes))." Tr. 91.

---

[3] Social Security Ruling 82-61 states, "a properly completed SSA-3369-F6, Vocational Report, may be sufficient to furnish information about past work." SSR 82-61, 1982 WL 31387, *2 (1982).

In his decision, the ALJ noted Belt "worked at a thrift shop in Deming until 2000" and "she testified that she did a lot of lifting, carrying, and moving furniture." Tr. 15. The ALJ also noted, "After reviewing the <u>record as a whole</u>, considering the level of treatment received, and the lack of objective findings, I substantially discount her complaints of disabling pain and limitations." Tr. 16 (emphasis added). Ultimately, the ALJ found Belt had past relevant work as a retail sales clerk and could perform this job "as it is generally performed in the national economy." Tr. 16. Contrary to Belt's argument, the ALJ had sufficient information to categorize her past relevant job as a retail sales clerk, as that position is defined in the Dictionary of Occupational Titles (DOT) . The ALJ also relied upon the DOT to find her job was at the light exertional work level. *Id.* This was proper. *See Andrade v. Secretary of Health and Human Servs.*, 985 F.2d 1045, 1051-52 (10th Cir. 1993)("The ALJ may rely on the Dictionary's job description for claimant's job category as 'presumptively applicable to a claimant's prior work.'"); *see also* 20 C.F.R. § 416.966 (d)(1)(authorizes administrative notice of reliable job information found in the DOT).

Belt also complains that her past work was very different and more physically demanding than that of a sales clerk. Pl.'s Mem. Br. at 5. However, under Social Security Ruling 82-61, Past Relevant Work– The Particular Job or the Occupation as Generally Performed, the ALJ may rely on "three possible tests for determining whether or not a claimant retains the capacity to perform his or her past relevant work . . . ." SSR 82-61, 1982 WL 31387, *1 (1982). Social Security Ruling 82-61 states in part:

> Three possible tests for determining whether or not a claimant retains the capacity to perform his or her past relevant work are as follows:

> 1. Whether the claimant retains the capacity to perform a past relevant job based on a broad generic, occupational classification of that job, e.g., "delivery job," Packaging job," etc.
>
>    Finding that a claimant has the capacity to do past relevant work on the basis of a generic occupational classification of the work is likely to be fallacious and unsupportable. While "delivery jobs," or "packaging jobs," etc., may have a common characteristic, they often involve quite different functional demands and duties requiring varying abilities and job knowledge.
>
> 2. Whether the claimant retains the capacity to perform the particular functional demands and job duties peculiar to an individual job as he or she actually performed it. Under this test, where the evidence shows that a claimant retains the RFC to perform the functional demands and job duties of a particular past relevant job as he or she actually performed it, the claimant should be found to be "not disabled."
>
> 3. <u>Whether the claimant retains the capacity to perform the functional demand and job duties of the job as ordinarily required by employers throughout the national economy</u>. (The Dictionary of Occupational Titles (DOT) descriptions can be relied upon– for jobs that are listed in the DOT– to define the job as it is usually performed in the national economy.). <u>It is understood that some individual jobs may require more or less exertion than the DOT description.</u> <u>A former job performed in by the claimant may have involved functional demands and job duties significantly in excess of those generally required for the job by other employers throughout the national economy</u>. **Under this test, if the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be "not disabled."**

SSR 82-61, 1982 WL 31387, *1-*2 (1982). In this case, the ALJ applied the third test in determining Belt retained the capacity to perform her past relevant work "as ordinarily required by employers throughout the national economy."

In *Andrade*, the Tenth Circuit addressed the same issue. Andrade argued that "S.S.R. 82-61 did not authorize the ALJ to consider <u>only the lighter duties of his past job</u>; rather, when considering whether [he] could perform his job as it is performed in the national economy, the ALJ must categorize [his] occupation in a way that reflects all significant aspects of [his] particular past job– particularly that he performed carpentry and plumbing in addition to the usual

15

duties of a general contractor." *Andrade*, 985 F.2d at 1051 (emphasis added). The Tenth Circuit deferred to Social Security Ruling 82-61 and rejected claimant's argument, stating:

> This court has previously held that a claimant could return to her past relevant work, even though her former job was no longer available. *Jozefowicz v. Heckler*, 811 F.2d 1352, 1356 (10th Cir. 1987). We looked to whether the claimant could "still do the type of job she did in the past." *Id.* (noting "a claimant's past work is the 'type' of work previously performed.") (citing *Tillery v. Schweiker*, 713 F.2d 610, 602 (10th Cir. 1983).
>
> Several other circuits have concluded that the phrase past relevant work includes a claimant's particular past relevant job, as well as the *type* of work claimant performed in the past, as that work is generally performed in the national economy. *See Martin v. Sullivan*, 901 F.2d 650, 653 (8th Cir. 1990)(following the test stated in S.S.R. 82-61 and noting that the First, Second, Fourth, Sixth, Seventh, Ninth, and Eleventh Circuits have all rejected the argument that "a claimant who cannot perform a particular past relevant job cannot perform his past relevant work"); *see also Villa v. Heckler*, 797 F.2d 794, 798 (9th Cir. 1986)(claimant must prove inability to return to former type of job, not just to specific prior job); *DeLoatche v. Heckler*, 715 F.2d 148, 151 (4th Cir. 1983)(same); *Orlando v. Heckler*, 776 F.2d 209, 215-16 (7th Cir. 1985)(adopting S.S.R. 82-61). We find no basis upon which to reject S.S.R. 82-61's interpretation of the phrase past relevant work. Therefore, claimant bears the burden of proving his inability to return to his particular former job and to his former occupation as that occupation is generally performed throughout the national economy.

*Id.* (emphasis added). Based on *Andrade*, Belt's contention that "[s]imilar work does not constitute past relevant work" fails. Accordingly, the Court finds that the ALJ properly relied on Social Security Ruling 82-61 to find Belt retained the capacity to perform her past relevant work "as ordinarily required by employers throughout the national economy."

Belt also argues her past work was more like a stock clerk, DOT 222.387-058, or an inventory clerk DOT 222.387-026. In order to perform these jobs, Belt would have to retain the RFC to perform heavy and medium work, respectively. The Court has reviewed the retail sales clerk position as described in the DOT. The DOT describes the job as:

> Obtains or receives merchandise, totals bills, accepts payment, and makes change for customers in retail store such as tobacco shop, drug store, candy store, or liquor store: Stocks shelves, counters, or tables with merchandise. Sets up advertising displays or arranges merchandise on counters or tables to promote sales. Stamps, marks, or tags price on merchandise. Obtains merchandise requested by customer or receives merchandise selected

by customer. Answers customer's questions concerning location, price, and use of merchandise. Totals price and tax on merchandise purchased by customer, using paper and pencil, cash register, or calculator, to determine bill. Accepts payment and makes change. Wraps or bags merchandise for customers. Cleans shelves, counters, or tables. Removes and records amount of cash in register at end of shift. May calculate sales discount to determine price. May keep record of sales, prepare inventory of stock, or order merchandise. May be designated according to product sold or type of store.

DOT 290.477-014; Pl.'s Ex. B. The DOT describes the job of stock clerk as:

Receives, stores, and issues equipment, material, supplies, merchandise, or tools, and compiles stock records in stockroom, warehouse, or storage yard: Counts, sorts, or weighs incoming articles to verify receipt of items on requisition or invoices. Examines stock to verify conformance to specifications. Stores articles in bins, on floor, or on shelves, according to identifying information, such as style, size, or type of material. Fills orders or issues supplies from stock. Prepares periodic, special, or perpetual inventory of stock. Requisitions articles to fill incoming orders. Compiles reports on use of stock handling equipment, adjustments of inventory counts and stock records, spoilage of or damage to stock, location changes, and refusal of shipments. May mark identifying codes, figures, or letters on articles, using labeling equipment. May distribute stock among production workers, keeping records of material issued. May make adjustments or repairs to articles carried in stock. May determine methods of storage, identification, and stock location, considering temperature, humidity, height and weight limits, turnover, floor loading capacities, and required space. May cut stock to size to fill order. May move or transport material or supplies to other departments, using hand or industrial truck. May maintain inventory and other stock records, using computer terminal.

DOT 222.387-058; Pl.'s Ex. C. The DOT describes the job of inventory clerk as follows:

Complies and maintains records of quantity, type, and value of material, equipment, merchandise, or supplies stocked in establishment; Counts material, equipment, merchandise, or supplies in stock and posts totals to inventory records, manually or using computer. Compares inventories to office records or computes figures from records, such as sales orders, production records, or purchase invoices to obtain current inventory. Verifies clerical computations against physical count of stock and adjusts errors in computation or count, or investigates and reports reasons for discrepancies. Compiles information on receipt or disbursement of material, equipment, merchandise, or supplies, and computes inventory balance, price, and costs. Prepares reports, such as inventory balance, price lists, and shortages. Prepares list of depleted items and recommends survey of defective or unusable items. May operate office machines, such as typewriter or calculator. May stock and issue materials or merchandise.

DOT 222.387-026; Pl.'s Ex. D. Comparing Belt's description of her job at St. Vincent De Paul's Thrift Store to the jobs of retail sales clerk, stock clerk and inventory clerk, the Court finds no

support for Belt's contention that her job at St. Vincent De Paul's Thrift Store was more like the jobs of stock clerk and inventory clerk. Belt also has not shown that "the duties of [her] prior job were sufficiently distinct from the duties of a [retail sales clerk] as described in the DOT to constitute a different line of work." *Andrade*, 985 F.2d at 1052. Thus, based on the record as a whole, the ALJ correctly categorized Belt's past job as that of a retail sales clerk. Accordingly, the Court finds that substantial evidence supports the ALJ's finding, at step four of the sequential evaluation process, that Belt retained the RFC to perform the job of retail sales clerk as it is generally performed in the national economy and was thus not disabled.

       A judgment in accordance with this Memorandum Opinion will be entered.

 

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**